## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**MARIANNE AHO,**                        )
)
       **Plaintiff,**                )
)
                              )        **Civil Action No.**
       **v.**                       )        **10-40052-FDS**
)
**COMMISSIONER OF SOCIAL**                )
**SECURITY ADMINISTRATION,**              )
)
       **Defendant.**                )
)
_____

## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
## AND PLAINTIFF'S MOTION TO REVERSE AND

**SAYLOR, J.**

      This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying plaintiff Mariann Aho's application for social security disability insurance

("SSDI") and supplemental security income ("SSI") benefits. Plaintiff contends that the decision

of the administrative law judge ("ALJ") was erroneous in multiple respects. Specifically, she

contends that the decision (1) failed to translate her right-eye blindness into functional limitations;

(2) relied on a vocational expert's opinion that (a) was inconsistent with a hypothetical limiting

her to "simple, routine tasks which require limited concentration," (b) did not specify time limits

of the sit/stand option, and (c) was inconsistent with the limitation that she  not work with

dangerous machinery; (3) did not appropriately consider her inability to drive; and (4) failed to

comply with SSR 00-4p by not resolving conflicts between the vocational expert's testimony and

the DOT.

Pending before the Court is plaintiff's motion to reverse the administrative decision and the Commissioner's motion to affirm. For the reasons set forth below, the motion to reverse will be granted and the motion to affirm will be denied.

## I. <u>Factual Background</u>

Mariann Aho is 54 years old. (AR at 136). She lives with her 83-year-old mother in Templeton, Massachusetts. (*Id.* at 20, 32). She graduated from high school and has one year of college education. (*Id.* at 20-21).

Aho worked as a certified nursing assistant through the onset of her alleged disability on January 1, 2003. (*Id.* at 21, 48). She stated that she stopped working because it became painful for her to lift. (*Id.* at 23).

On an average day, Aho drinks coffee, watches television, speaks to her mother, feeds the cat, does the dishes, and reads. (*Id.* at 161). She also prepares her own meals, although she seldom goes grocery shopping, and vacuums the house. (*Id.* at 166-67).

Aho visits her friends one to two times per month. (*Id.* at 30-31). While there, she will drink three to four beers, and will also occasionally smoke marijuana. (*Id.*). She has tested positive for cannabinoid multiple times over the course of her period of alleged disability. (*Id.* at 263, 266, 318-19, 321, 345, 347).

### A. <u>Medical Evidence</u>

#### 1. <u>Cervical Degenerative Disc Disease</u>

Aho suffers from cervical degenerative disc disease. (*Id.* at 256). On October 27, 2006, she underwent an MRI of her cervical spine. (*Id.* at 316). It revealed that she had a degenerating disc at C6-C7. (*Id.*). Because of this, she suffers moderate arthritis at C6-C7. (*Id.*). In addition,

there was a neuroforaminal encroachment, which was more prominent on the left side. (*Id.*).

Jyoti Nagarkar, M.D., is Aho's primary care physician. (*Id.* at 314). Dr. Nagarkar treated her for pain associated with the degenerative disc disease and prescribed Percocet. (*Id.* at 314-15).

In June 2008, an MRI revealed that Aho had a large left lateral ostephyte[1] with moderate to severe left C6-C7 neuroforaminal stenosis. (*Id.* at 322). Aho did not want steroid injections to help with the pain. (*Id.*). Dr. Nagarkar recommended physical therapy for the neck and back, and stated that she believed she was a better candidate for physical therapy than injections. (*Id.* at 322, 325).

On August 19, 2008, Dr. Nagarkar roughly outlined how Aho's back and neck pain associated with her cervical degenerative disc disease functionally limit her. (*Id.* at 322). He stated that she cannot do one activity for a long time. (*Id.*). For example, she cannot sit or stand in one position for a prolonged period of time. (*Id.*). Moreover, she cannot lift anything heavier than 20 pounds. (*Id.*).

## 2. Left Shoulder Pain, Right Ankle and Knee Pain, and Osteoarthritis

In April 28, 2003, Aho injured her ankle. (*Id.* at 254). She did not seek medical treatment until two to three weeks after the injury occurred. (*Id.*). On June 20, 2003, Osama A. Al-Masri, M.D., an orthopedic surgeon, noted that an x-ray indicated that she had a fracture of the lateral malleolus[2] but that it was healing. (*Id.*). The examination revealed that her right ankle was

---

[1] An osteophyte is a "bony outgrowth or protuberance." STEDMAN'S MEDICAL DICTIONARY 1270 (26th ed. 1995).

[2] The malleolus is a "rounded bony prominence such as those on either side of the ankle joint." *Id.* at 1057.

swollen and tender. (*Id.*).

On May 11, 2004, Aho had an x-ray of her left shoulder. (*Id.* at 207). It revealed that the fracture was healing but that she had mild osteoarthritis. (*Id.*).

On July 30, 2004, a bone density analysis of her hip revealed that she suffers from osteoporosis. (*Id.* at 206).

On October 15, 2004, she had an x-ray of her right knee. (*Id.* at 204). The x-ray revealed that there was a small calcified loose body. (*Id.*). Apart from that, there was nothing remarkable. (*Id.*).

Aho currently takes Percocet to deal with the pain associated with her physical ailments. (*Id.* at 24). She testified that her pain is typically at a level two out of ten, although it is more pronounced at the end of a dosage period. (*Id.* at 26)

### 3.    Right-Eye Blindness

Aho has a history of retinal detachment in her right eye. (*Id.* at 278, 348, 358). On July 23, 1999, she underwent a scleral buckle to reattach the retinal nerve. (*Id.* at 348). David Agahigian, M.D., performed the surgery. (*Id.*).

In a follow-up appointment with Frank McCabe, M.D., Aho's visual acuity was 20/200 in the right eye and 20/25 in the left eye. (*Id.* at 351). On May 7, 2003, an examination indicated that those visual acuity scores had remained stable. (*Id.* at 350).

On May 31, 2007, Andrea Carr, an opthamologist, diagnosed chronic open angle glaucoma, aphakia, retinal detachment, ptosis, and keratitis in the right eye. (*Id.* at 278-79). She indicated that the keratitis was expected to improve and that the other conditions were expected to remain stable. (*Id.*).

### 4.    **Physical Residual Functional Capacities**

On May 24, 2007, Leslie Cronister, M.D., a state agency physician, conducted a review of Aho's physical residual functional capacity ("RFC"). (*Id.* at 270-77). Dr. Cronister stated that the primary diagnosis was neck pain and the secondary diagnosis was vision issues, but indicated that Aho had failed to establish any visual limitations as the record currently stood. (*Id.* at 270, 273). In terms of exertional limitations, she found that Aho could lift 20 pounds occasionally and ten pounds frequently. (*Id.* at 271). Dr. Cronister also indicated that she could stand or walk with normal breaks for two hours in an eight-hour workday and sit with normal breaks for six hours in an eight-hour workday, and that she would be able to push or pull, including operation of hand and foot controls, for an unlimited amount of time. (*Id.*).

Dr. Cronister stated that Aho could occasionally climb ladders, ropes, or scaffolds, and could occasionally crouch and crawl. (*Id.* at 272). She could climb ramps and stairs, balance, stoop, and kneel frequently. (*Id.*). She could not reach overhead due to her neck issues. (*Id.* at 273). Her only environmental limitation was that she avoid concentrated exposure to hazards such as machinery and heights. (*Id.* at 274). Dr. Cronister noted that there is evidence of "drug-seeking behavior." (*Id.* at 275). Dr. Cronister also noted that her credibility is poor. (*Id.*).

### 5.    **Mental Impairments**

On July 18, 2007, Mark Brooks, Ph.D., conducted a mental assessment. (*Id.* at 281). He indicated that Aho had a history of substance abuse. (*Id.* at 282). Dr. Brooks stated that she drank to the point of intoxication about two times per week and that she drank three to twelve beers on a single occasion. (*Id.*). She has been convicted five times for driving under the

influence, most recently in 2002, for which she served three months in jail. (*Id.*).[3]

Dr. Brooks stated that Aho reported chronic sadness, low energy, low appetite, very disturbed sleep, and a grim view of the future. (*Id.* at 283). She also reported experiencing anxiety attacks three times a week that lasted from five to 60 minutes. (*Id.*). These attacks dissipate when she takes anxiety medication. (*Id.*).

Dr. Brooks further noted that Aho was alert and oriented to person, place, and time. (*Id.*). There was no indication that she had any suicidal ideation, intentions, or plans, nor did she suffer from hallucinations or delusions. (*Id.*). Moreover, she remained in the average recall range, being able to recall five digits forward and five digits backwards. (*Id.* at 284).

Dr. Brooks formally diagnosed (1) alcohol abuse; (2) depressive disorder, not otherwise specified; (3) anxiety disorder, not otherwise specified; and (4) personality disorder, not otherwise specified, with antisocial personality disorder features. (*Id.* at 285). Her global assessment of functioning score was 50. (*Id.*).

### 6.     Mental Residual Functional Capacity

On July 31, 2007, Celeste Derecho, Ph.D., calculated Aho's mental RFC. Dr. Derecho concluded that her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, and to understand and remember detailed instructions were not significantly limited by her mental impairments. (*Id.* at 301).

In the area of sustained concentration and persistence, Dr. Derecho indicated that Aho was moderately limited in her ability to perform activities within a schedule, maintain regular

---

[3] During the hearing, plaintiff testified that she was incarcerated for nine months for the 2002 conviction. (*Id.* at 22).

attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 301-302). However, her ability to carry out simple and detailed instructions and to maintain attention and concentration for extended periods of time was not significantly limited. (*Id.* at 301). Dr. Derecho stated that she retained the capacity to focus on a simple or detailed task over a two-hour time frame. (*Id.* at 303). Moreover, she stated that Aho can manage the pace and attendance of a full-time job. (*Id.*).

As to social interaction, Dr. Derecho indicated that Aho was moderately limited in her ability to interact appropriately with the general public. (*Id.* at 302). She stated that because of Aho's low mood and anxiety, her job performance would be better if she did not interact with the public. (*Id.* at 303).

## II.     Procedural Background

Plaintiff applied for SSDI and SSI benefits on May 1, 2007. (*Id.* at 136-146). The application was denied on initial review on August 1, 2007, and subsequently by a Federal Reviewing Official on May 20, 2008. (*Id.* at 7). Plaintiff requested an administrative hearing, which was held on September 18, 2009. (*Id.*). Both plaintiff, who was represented by counsel, and a vocational expert testified. (*Id.*).

The ALJ issued its decision on November 4, 2009, finding that plaintiff was not disabled. (*Id.* at 16). On February 5, 2010, the Decision Review Board notified plaintiff that it was affirming the ALJ's decision, which made the ALJ's decision final. (*Id.* at 1). Having exhausted her administrative remedies, plaintiff filed this complaint on March 15, 2010. *See* 20 C.F.R. §

405.420(b)(2) (2010).

## III.  **Analysis**

### A.  **Standard of Review**

This Court's review of a Social Security disability benefit determination is limited.  *See* 42 U.S.C. § 405(g) (2010).  Questions of law are reviewed *de novo*, but findings of fact, "if supported by substantial evidence, shall be conclusive."  *See id.*; *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### B.  **Standard for Entitlement to SSDI and SSI Benefits**

An individual is not entitled to SSDI or SSI benefits unless she is "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context of SSI).  "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be severe enough to prevent plaintiff from performing not only past work, but any substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[4] The claimant has the burden of production and proof during steps one through four, and the Commissioner has the burden at step five to offer evidence of specific jobs in the economy that the applicant can perform. *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

## C. **Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4), but concluded that plaintiff was not disabled. (AR at 8-16).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful employment since January 1, 2003, her alleged onset date. (*Id.* at 9). At step two, the ALJ determined that plaintiff had the following severe impairments: (1) cervical degenerative disc

---

[4] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

disease; (2) left-shoulder pain; (3) right-ankle and right-knee pain; (4) right-eye blindness; (5) osteoarthritis; and (6) anxiety. (*Id.* at 10). He stated that these impairments in combination were severe. (*Id.*). At step three, the ALJ concluded that plaintiff did not meet a listing pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

At step four, the ALJ indicated that plaintiff retained the physical RFC to perform light exertional work, except that she requires a sit/stand option. (*Id.* at 11). She is limited to no more than occasional climbing and cannot kneel or crawl. (*Id.*). She cannot do work associated with overhead reaching. (*Id.*). Moreover, she should avoid heights, ladders, and other hazards such as dangerous machinery. (*Id.*). She also is limited to monocular vision and cannot drive a motor vehicle. (*Id.*).

In terms of plaintiff's mental RFC, the ALJ found that plaintiff is best suited to simple, routine, repetitive tasks that require limited concentration. (*Id.*). She is also better suited to work with things rather than people. (*Id.*). Given plaintiff's mental and physical limitations, the ALJ found that plaintiff is unable to perform her past work as a nursing assistant. (*Id.* at 14).

The ALJ next proceeded to step five, where he solicited the aid of a vocational expert. (*Id.* at 15, 35). The ALJ posed two hypotheticals to the vocational expert. In the first hypothetical, the ALJ inquired:

> Assume we have an individual with the same age, educational background and past work experience as the claimant. Further assume the individual retains the residual functional capacity for work with the following additional limitations . . . She would be limited to light work. She would require a sit/stand option. There would be no more than occasional climbing. There would be no heights, no ladders, no hazards or dangerous machinery, no kneeling or crawling. There would be no overhead work or overhead reaching with the nondominant upper extremity. She would be limited to simple, routine tasks which require limited concentration. She would be better suited working with things rather than

working with people and she would be limited to monocular vision . . . [and] there'd be no driving. So given those limitations, would such an individual be able to perform the claimant's past work or any other work?

(*Id.* at 36).

The vocational expert offered three jobs that an individual with those limitations could perform. (*Id.* at 36-38). First, she could perform the job of a small products assembler, which is light exertional, unskilled work requiring a reasoning level of two. (*Id.* at 36, 38). There are 288,500 of those jobs nationally and 200 in western Massachusetts. (*Id.* at 36). Second, she could perform the job of a folding machine operator, which is light exertional, unskilled work requiring a reasoning level of two. (*Id.* at 36, 38). There are 143,000 folding machine operator jobs nationally and 100 regionally. (*Id.* at 36-37). Third, she could perform the job of a press operator, which is light exertional, unskilled work requiring a reasoning level of two. (*Id.* at 37-38). There are 69,000 of these jobs nationally and 100 in western Massachusetts. (*Id.* at 37).

The ALJ's second hypothetical added the limitation that the individual was markedly impaired in his/her ability to maintain persistence and pace. (*Id.*). The vocational expert stated that under those circumstances, there would be no jobs. (*Id.*).

At step five, given the RFC he calculated for plaintiff, the ALJ relied on the vocational expert's response to the first hypothetical. (*Id.* at 11, 15). The ALJ concluded that plaintiff was capable of performing the job of a small products assembler, a folding machine operator, and a press operator (*Id.* at 15). The ALJ further noted that pursuant to Social Security Ruling ("SSR") 00-4p, the vocational expert's testimony was consistent with the Dictionary of Occupational Titles ("DOT"), and therefore, he adopted that testimony. (*Id.*).

### D.    Plaintiff's Objections

Plaintiff contends that the ALJ erred in six ways.  First, she contends that the ALJ's decision failed to translate her right-eye blindness into functional limitations.  Second, she contends that the decision erroneously relied on a vocational expert's opinion that she could perform jobs with a reasoning level of two despite her being limited to "simple, routine tasks" that "require limited concentration."  Third, she argues that the decision erroneously relied on a hypothetical that did not specify time constraints as to the sit/stand option.  Fourth, she contends that the decision erroneously relied on a vocational expert's opinion that was inconsistent with the limitation that she not work with dangerous machinery.  Fifth, she argues that the decision failed to account for her inability to drive.  Sixth, she contends the decision failed to resolve conflicts between the vocational expert's testimony and the DOT as required by SSR 00-4p.

### 1.    Right-Eye Blindness

Plaintiff first contends that the ALJ's hypothetical was in error because he failed to translate her right-eye blindness into functional limitations when presenting the RFC to the vocational expert.  When presenting a hypothetical to a vocational expert, the question "must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." *Newton v. Chater*, 92 F.3d 688, 694-95 (8th Cir. 1996); *see also Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Podedworny v. Harris*, 745 F.2d 210, 218-19 (3rd Cir. 1984).  "[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982).  Therefore, the hypothetical posed to a medical expert must include all

of the claimant's relevant impairments.  *Rose v. Shalala*, 34 F.3d 13, 19 (1st Cir. 1994); *Brown v. Chater*, 927 F. Supp. 10, 17 (D. Mass 1996).

An ALJ cannot interpret raw medical evidence to discern functional limitations.  *Nyugen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms . . . ."); *Gordilis v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.").  However, "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment."  *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996).

Here, the ALJ's hypothetical did not accurately capture the limitations imposed by plaintiff's right-eye blindness.  Dr. Cronister's RFC, upon which the ALJ relied, indicated that plaintiff had not established that she had a visual impairment.  (AR at 273).  However, that RFC was completed before medical evidence concerning plaintiff's right-eye blindness was included in the record.  Moreover, the ALJ did not have the requisite expertise to translate that right-eye blindness into functional limitations, such as near acuity, far acuity, depth perception, accommodation, color vision, or field of vision.  The Physical Residual Functional Capacity Assessment explicitly requires that a plaintiff's visual impairment be analyzed according to those six functional limitations.  Because the ALJ did not pose to the vocational expert a hypothetical that outlined those detailed functional visual limitations, the vocational expert's opinion did not include potentially relevant limitations.

If right-eye blindness in fact imposes functional visual limitations, it may prevent plaintiff from working at the jobs proffered by the vocational expert.[5]  The job of a small products assembler requires that the worker frequently use near acuity, depth perception, and accommodation.  U.S. Dep't of Labor, DOT (4th ed. 1991), 1991 WL 679050, at 706.684-022.  The job of a folding machine operator requires workers to use near acuity frequently.  *Id.*, 1991 WL 673069, at 369.686-010.

No such visual requirements appear to exist for the job of press operator.  *Id.*, 1991 WL 673019, at 363.685-010.  However, there may be an issue as to whether this job exists in significant numbers regionally and nationally.  In order for the Commissioner to satisfy his burden at step five, he must show that work "exists in significant numbers either in the region where [the claimant] lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  There is no "magic, sufficient number."  *Tetrault v. Astrue*, 2011 WL 613701, at *6 (D. Mass. Feb. 11, 2011); *see also Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  Courts have found that fewer than 200 jobs can satisfy the "significant numbers" requirement.  *E.g.*, *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (finding 200 jobs in region sufficient); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (finding 174 jobs in the local area sufficient); *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (finding 110 jobs in the region is sufficient).

It would appear that 100 jobs is sufficient to meet the statutory threshold.  However, given the circumstances of this case, and in light of the issue as to the "dangerous machinery" limitation noted below, the Court will remand this case for further proceedings to permit the ALJ

---

[5]  The Court notes that SSR 83-10 states that an "RFC generally represents an exertional work capability for all work at any functional level(s) below that used in the table under consideration."  SSR 83-10, 1983 WL 31251 at *2 (S.S.A. 1983).  Therefore, plaintiff may also be qualified to perform sedentary work.

to translate plaintiff's right-eye blindness into functional limitations and to examine whether jobs exist in significant numbers that she can perform.

## 2. **GED Reasoning Levels**

Plaintiff further contends that the ALJ's hypothetical, which is limited her to "simple, routine tasks which require limited concentration," is inconsistent with the reasoning level of two attributed to the jobs of press operator, folding machine operator, and small products assembler. Plaintiff bases her argument on the General Educational Development ("GED") reasoning scale in the DOT issued by the Department of Labor.[6]

The DOT assigns a GED reasoning level to listed occupations, ranging from one as the lowest level to six as the highest. DOT, App. C, 1991 WL 688702. GED level one requires that plaintiff have the ability to "carry out simple one- or two-step instructions" and "deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* Level two requires that plaintiff have the ability to "carry out detailed but uninvolved written or oral instructions" and "deal with problems involving a few concrete variables in or from standardized situations." *Id.*[7] Plaintiff contends that the ALJ's finding that

---

[6] The Commissioner states that plaintiff "mistakenly argues . . . that the vocational expert described those jobs as requiring a General Educational Level ('GED') of 2" during the hearing. (Def. Mem. 13). Defendant is incorrect because, at the hearing, plaintiff's counsel explicitly asked the reasoning level of the three jobs identified by the vocational expert. (AR at 38). The rest of the Commissioner's argument rests on the fact that plaintiff has the ability to perform a job with an SVP of two. The thrust of plaintiff's argument is that the RFC and jobs cited by the vocational expert conflict regarding GED level not SVP.

[7] Levels three through six consist of the following:

Level 3—Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

Level 4—Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form.

she is limited to "simple, routine tasks which require limited concentration" means that she can only perform jobs with GED reasoning level of one, and because the DOT classifies the jobs of a small products assembler, a press operator, and a folding machine operator with a GED reasoning level of two, she is not qualified for that work.

While the First Circuit has yet to address this issue, three circuit courts have found that a restriction to "simple, routine tasks" is not mutually exclusive with the ability to perform the reasoning level two jobs. *See Lara v. Astrue*, 2008 WL 4927346, at *1 (9th Cir. Nov. 19, 2008) ("[S]omeone able to perform simple, repetitive tasks is capable of doing work requiring more rigor and sophistication—in other words, Reasoning Level 2 jobs."); *Stokes v. Astrue*, 2008 WL 1766788, at *8 (10th Cir. Apr. 18, 2008) ("we [have] held that a limitation 'for simple and routine work tasks' was inconsistent with the demands of level-three reasoning but consistent with the demands of level-two reasoning . . . ."); *Money v. Barnhart*, 2004 WL 362291, at *3 (3d Cir. Feb. 25, 2004) ("Working at reasoning level 2 would not contradict the mandate that [the claimant's] work be simple, routine and repetitive."). Two circuits have gone even further, concluding that a reasoning level of three does not necessarily conflict with an RFC limited to simple tasks. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Hillier v. S.S.A.*, 486 F.3d 359, 367 (8th Cir. 2007). Moreover, this Court has previously noted its agreement with the notion

<hr />

Level 5—Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables.

Level 6—Apply principles of logical or scientific thinking to a wide range of intellectual and practical problems. Deal with nonverbal symbolism (formulas, scientific equations, graphs, musical notes, etc.) in its most difficult phases. Deal with a variety of abstract and concrete variables. Apprehend the most abstruse classes of concepts.

*Id.*

that a claimant limited to "simple and unskilled tasks" may still be able to perform a job at a reasoning level of two. *Lafrennie v. Astrue*, 2011 WL 1103278, at *8 (D. Mass. March 23, 2011).

In arguing that the vocational expert's further qualification of "limited concentration" exempts her from the ability to perform jobs with a reasoning level of two, plaintiff relies heavily on *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005) and *Whitzell v. Barnhart*, 379 F. Supp. 2d 204 (D. Mass. 2005).

In *Edwards*, the court found that an ALJ's limitation to simple, routine, unskilled work "[was] not sufficient, and [does] not fully convey Plaintiff's limitation in concentration to the VE." 383 F. Supp. 2d at 930. The ALJ in *Edwards* was in error because plaintiff's concentration limitations were not taken into consideration at all in the hypothetical. *Id.* Here, by contrast, the ALJ added a concentration component to his hypothetical, limiting plaintiff to "simple, routine tasks which require limited concentration." (AR at 36).

In *Whitzell*, the court stated that

> While the hearing officer did conclude that Whitzell was able to maintain concentration required for more complex and detailed tasks, he stated that this concentration could not be sustained for extended periods of time or on a continuous basis. Such a limitation is inconsistent with a reasoning level two position. . . .

379 F. Supp. 2d at 219 (internal citations omitted). However, the ALJ determined that plaintiff retained a residual functional capacity to

> maintain concentration and attention sufficient to perform simple work tasks for an eight hour workday assuming short work breaks on average every two hours. The claimant would be able to maintain attention and concentration required for more complex or detailed tasks occasionally but not for extended periods of time and not on a continuous basis.

*Id.* Thus, the court in *Whitzell* found plaintiff's RFC incompatible with a reasoning level of two because plaintiff could only maintain concentration on detailed tasks for less than two hours. *Id.* In contrast, there is substantial evidence here suggesting that plaintiff does not have such a deficiency. Dr. Derecho noted in her mental RFC that plaintiff could focus on simple *or detailed* tasks over a two-hour time frame. (AR at 303).[8]

Moreover, Dr. Derecho also stated that plaintiff's ability to understand and remember detailed instructions was not significantly limited. (*Id.* at 301). In addition, her ability to carry out detailed instructions was not significantly limited. (*Id.*). This further suggests that plaintiff can understand, remember, and carry out detailed instructions, and that her level of ability is not inconsistent with the ability to carry out "detailed but uninvolved" instructions as described in GED reasoning level two. Furthermore, the fact that plaintiff attended one year of college provides further support that she possesses the ability to perform a job with reasoning level two. (*Id.* at 20).

---

[8] It is unclear what plaintiff is trying to argue as to the two-hour time frame restriction. Plaintiff could either be arguing (1) the limited concentration distinction is more significant because of the two-hour restriction, or (2) the ALJ erred by not including the two-hour time frame restriction in his RFC.

The first argument is without merit. As stated above, in *Whitzell*, the claimant's ability to perform jobs at a reasoning level two was questioned because she could only sustain concentration on detailed tasks for less than two-hour intervals. *Whitzell*, 379 F. Supp. 2d at 219. Plaintiff here, however, retains the ability to perform detailed tasks for a two-hour period, which does not conflict with her ability to perform jobs with a reasoning level of two.

The second argument is also unpersuasive. An ALJ is not required to adopt the entirety of a doctor's RFC, especially a non-treating source. 20 C.F.R. 404.1527(d)(2), (f); SSR 96-5p, 1996 WL 374183, at *5 (S.S.A. July 2, 1996) ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment"). SSR 96-5p states that the ALJ is the final arbiter with respect to plaintiff's RFC. SSR 96-5p, at *2. Therefore, the ALJ was entitled to accept or reject the two-hour time frame limitation in calculating plaintiff's RFC.

Accordingly, there is substantial evidence that plaintiff can perform jobs with a reasoning level two, and the ALJ's limitation in the hypothetical to "simple, routine tasks which require limited concentration" is not inconsistent with that conclusion.

### 3.     Sit/Stand Option

Plaintiff also argues that the ALJ erred in failing to outline the time parameters for the sit/stand option in his hypothetical to the vocational expert.  Plaintiff relies heavily upon SSR 96-9p and case law dealing with sit/stand options where claimants only retain the capacity to perform sedentary work.  Those sources, however, do not require a different result.

SSR 96-9p deals with situations in which a claimant can perform less than the full range of sedentary work.  Where a person capable of sedentary work requires a sit/stand option, the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing."  SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  The policy behind requiring that degree of specificity is because sedentary work "represents a significantly restricted range of work."  *Id.* at *3.  By placing further limitations on the full range to perform that type of work, the occupational base for which a claimant is qualified is more limited in number.  Where "the full range of sedentary work is significantly eroded," a finding of disability is typically appropriate.  *Id.*  Therefore, it is crucial that the further limitations on a claimant's ability to perform sedentary work be specific in order to determine how much the occupational base has eroded.

Here, however, the ALJ found that plaintiff was capable of performing light exertional work.  Inherent in a claimant's determined exertional level is the ability to perform all lesser exertional levels.  SSR 83-10, at *2 ("RFC generally represents an exertional work capability for

all work at any functional level(s) below that used in the table under consideration."). Thus, because plaintiff retains the ability to perform both light exertional work and sedentary work, any concerns as to erosion of the occupational base are substantially reduced.

Moreover, SSR 83-12 explicitly deals with situations, such as here, where a claimant's capacity is between exertional levels. While plaintiff can perform most of the requirements for light exertional work, the ALJ determined that her capacity to walk/stand was slightly less than that required for light exertional work. Therefore, he imposed a sit/stand option. Where the ALJ determines that a sit/stand option is required, SSR 83-12 only requires that "a VS [vocational specialist or expert] should be consulted to clarify the implications for the occupational base." SSR 83-12, 1983 WL 31253, at *4 (S.S.A. 1983). Here, the ALJ complied with SSR 83-12. He consulted a vocational expert to determine what light exertional jobs were available to plaintiff that allow a sit/stand option, and the vocational expert determined that the job of a press operator, a folding machine operator, and a small products assembler met those criteria. (AR at 36-37). Therefore, the ALJ's hypothetical requiring a sit/stand option was sufficiently detailed.

Finally, no circuit court has required the specificity asserted by plaintiff concerning the sit/stand option where a claimant has been found capable of performing light exertional work. *See, e.g.*, *Henderson v. Social Security Admin.*, 2004 WL 75380, at *3, 3 n.5 (3rd Cir. Jan. 14, 2004) (finding that a hypothetical that an individual could perform light exertional work that allowed for alternating between sitting and standing was not erroneous because the ALJ employed the assistance of a vocational expert); *Walls v. Barnhart*, 296 F.3d 287, 291-92 (4th Cir. 2002) (finding that the ALJ properly consulted and relied on vocational expert's testimony regarding sit/stand option in accordance with SSR 83-12).

Accordingly, because the ALJ complied with SSR 83-12 and sought testimony from a vocational expert to determine what jobs were available with a sit/stand option, there was no error.

### 4. No "Dangerous Machinery" Restriction

Plaintiff next argues that the jobs of small products assembler, press operator, and folding machinery operator, all of which require use of machinery, conflict with the ALJ's limitation that plaintiff not be around "dangerous machinery."

The ALJ determined in his RFC that plaintiff should avoid dangerous machinery. As the Commissioner correctly points out, this is not a restriction that plaintiff avoid *all* machinery. (Def. Br. 12). SSR 83-14 clarifies what is meant by "dangerous machinery" in the physical RFC assessment form, stating that "a person may be able to do anything so long as he or she is not near dangerous *moving* machinery." SSR 83-14, 1983 WL 31254, at *2 (S.S.A. 1983) (emphasis added). For the purpose of determining what kinds of machines are being used, the number in the sixth position in the DOT number is the relevant one. *See Oyola-Rosa v. Sec'y of Health & Human Servs.*, 1992 WL 387678, at *9 (1st Cir. Dec. 30, 1992). Small products assembler has a "4" in the sixth position, indicating that it requires workers to use "body members, tools, or special devices to work, move, guide, or place objects or materials." DOT, App. B, 1991 WL 688701. Press operator is a "5" job, indicating that it requires workers to adjust "materials or controls of the machine, such as changing guides, adjusting timers and temperature gauges, turning valves to allow flow of materials, and flipping switches in response to lights." *Id.* In particular, the worker must push "buttons to lower [the] pressing head of [the] machine to press and dry [the] garment." DOT, 1991 WL 673019, at 363.685-010. As in *Oyola-Rosa*, these are

not occupations that fall into the dangerous moving machinery category. 1992 WL 387687, at *9.

However, there is a potential issue with the folding machine operator job cited by the vocational expert. The job of folding machine operator requires the worker to feed laundry onto a feeder conveyor belt and to remove jammed articles from the machine. DOT, 1991 WL 673019, at 369.686-010. Because there is no indication that plaintiff has ultimate control over this machine's movements, it may fall within the category of "dangerous moving machinery." *See Oyola-Rosa*, 1992 WL 387687, at *9. Accordingly, on remand, the ALJ should consider whether plaintiff retains the RFC to perform the job of folding machine operator in light of the "dangerous machinery" limitation.

### 5. <u>Inability to Drive</u>

Plaintiff next contends that the ALJ's restriction that plaintiff not drive a motor vehicle is inconsistent with the vocational expert's statement that there were jobs available in western Massachusetts. More specifically, she states that the work available to her based on the restriction that she not travel by car would not meet the "significant number" requirement at step five. For the reasons stated below, the Court finds this argument unconvincing.

Under the statute, a person is "disabled" if:

his physical or mental impairment or impairments are of such a severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy, *regardless of whether such work exists in the immediate area in which he lives* . . . .

42 U.S.C. § 423(d)(2)(A) (emphasis added). A disabled plaintiff is thus presented with a choice: "he can choose either to commute the distance to his job or he can move closer and avoid the

expense and inconvenience." *Lopez Diaz v. Sec'y of Health, Education, & Welfare*, 585 F.2d 1137, 1140 (1st Cir. 1978). The First Circuit has, however, carved out an exception. *Id.* Where "the claimant asserts that his locomotive disabilities render it impossible, or extremely difficult, for him to physically move his body from home to work," the distance from a claimant's residence to the jobs cited by the vocational expert should be considered. *Id.*; *see also Rasmussen-Scholter v. Barnhart*, 2004 WL 1932776, at *7 n.7 (D. Mass. Aug. 16, 2004). However, "if the disabilities of the hypothetical claimant would not *in and of themselves* prevent him or her from traveling by some normally available means of transportation, either public or private, to 'work which exists in the national economy,' he will not be deemed disabled on incapacity to travel grounds." *Lopez Diaz*, 585 F.2d at 1142 (emphasis added). This inquiry focuses on a hypothetical claimant in the United States, not the actual plaintiff. *Id.*

Here, the connection between plaintiff's inability to drive and her right-eye blindness is doubtful at best. Plaintiff has reported that she cannot drive because of her right-eye blindness, but there is no impartial evidence to that effect. (AR at 154, 167). There is also substantial evidence that her lack of driver's license is a product of her multiple convictions for drunk driving. (*Id.* at 22).

Furthermore, plaintiff's disabilities alone would not prevent a hypothetical claimant from traveling by some normally available means of transportation. *See Lopez Diaz*, 585 F.2d at 1137, 1141-42. Plaintiff notes that there is no public transportation in Templeton, Massachusetts; however, *Lopez Diaz* makes clear that it is not what *is* available but what is *normally* available to a hypothetical claimant in the United States. *See* 585 F.2d at 1142. A mix of transportation options, including public transportation, is typically available, and there is no evidence in the

record suggesting that plaintiff is unable to take such transportation. Furthermore, there may be other transportation options available to plaintiff, such as taking a cab or carpooling with coworkers. Therefore, plaintiff's inability to drive, even assuming it is due to right-eye blindness, does not fall within the limited exception in *Lopez Diaz*.

### 6. ALJ's Failure to Comply with SSR 00-4p

Finally, plaintiff argues that the ALJ did not clarify any potential conflicts between the vocational expert's testimony and the DOT, and therefore did not comply with SSR 00-4p. The Court is unpersuaded.

SSR 00-4p requires that "when vocational evidence provided by a [vocational expert] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the [vocational expert] evidence to support a determination or decision that the individual is or is not disabled." SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000). However, the ALJ need only resolve such conflicts where they are apparent and have been identified. *Id.*, at *2 ("When there is an apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator must elicit a reasonable explanation . . . ."); *see also Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (SSR 00-4p "requires an explanation only if the discrepancy was 'identified' . . . ."); *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing."). An ALJ merely stating "pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the

information contained in the Dictionary of Occupational Titles" is not sufficient to satisfy SSR 00-4p where an apparent conflict exists. *See Wilson v. Astrue*, 2010 WL 1379889, at *9 (D. Mass. March 30, 2010).

Plaintiff contends that the ALJ failed to resolve inconsistencies in the jobs offered by the vocational expert and plaintiff's visual and no-dangerous-machinery restrictions. Because the inconsistency was not identified during the hearing, the ALJ was not required to explain the conflict.

As stated above, there is an apparent inconsistency between the ALJ's RFC and the vocational expert's testimony concerning the dangerous-machinery limitation and the folding machine operator job. However, there is no indication that this discrepancy was identified during the hearing. Plaintiff's counsel failed to inquire on this issue or to raise an objection to the vocational expert's testimony. *See Donahue*, 279 F.3d at 447 ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late. An ALJ is not obliged to reopen the record."); *Carey*, 230 F.3d at 147 (accepting vocational expert's testimony, in part, because the testimony was unchallenged); *Corcoran v. Astrue*, 2011 WL 2023292, at * 7 (D. Mass. April 15, 2011) ("Plaintiff did not raise the issue of the consistency of the vocational expert's testimony with the DOT at the hearing or even in his appeal to the Appeals Council"); *Pires v. Astrue*, 553 F. Supp. 2d 15, 25 (D. Mass. 2008) ("Plaintiff's attorney did not object to [the vocational expert's] testimony"). Therefore, even assuming that an inconsistency does exist, there was no violation of SSR 00-4p.

The inconsistency regarding plaintiff's visual limitations was also not apparent. Because plaintiff's visual limitations were not translated into functional limitations, it was not obvious that

her visual capabilities were incompatible with the job requirements. Furthermore, as stated above, plaintiff's counsel did not question the vocational expert on this issue nor did plaintiff's counsel raise an objection to the vocational expert's testimony. Thus, the ALJ complied with SSR 00-4p concerning plaintiff's visual limitations, and the decision was not erroneous in that respect.

IV.     **Conclusion**

For the foregoing reasons, plaintiff's motion to reverse will be GRANTED, and the Commissioner's motion to affirm will be DENIED. This Case is remanded for further proceedings.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  August 10, 2011